# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 2, 2012

## STATE OF TENNESSEE v. LAWRENCE KEY

**Appeal from the Criminal Court of Shelby County**
No. 10-07654    Carolyn Wade Blackett, Judge

_____

**No. W2012-00145-CCA-R3-CD  - Filed November 15, 2012**

_____

Lawrence Key ("the Defendant") appeals his jury convictions for two counts of aggravated robbery. In his appeal, he asserts that the evidence presented at trial was insufficient to support his convictions. After a thorough review of the record and the applicable law, we affirm the Defendant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments
of the Criminal Court Affirmed**

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROGER A. PAGE, JJ., joined.

Steven C. Bush, Public Defender; Barry W. Kuhn, Assistant Public Defender (on appeal); and James Hale, Assistant Public Defender (at trial), Memphis, Tennessee, for the appellant, Lawrence Key.

Robert E. Cooper, Jr., Attorney General & Reporter; Clark B. Thornton, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pam Fleming, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Factual and Procedural Background

A Shelby County Grand Jury indicted the Defendant and Andrea Key, the Defendant's cousin, on two counts of aggravated robbery. Prior to the Defendant's trial, the State filed a notice of intent to seek an enhanced punishment for the Defendant pursuant to Tennessee Code Annotated section 40-25-120. The Defendant was tried before a jury on October 24-27, 2011. The Defendant's trial was bifurcated into two parts: the first to establish the

Defendant's guilt as to the two counts of aggravated robbery; and the second to determine whether the Defendant had at least two prior convictions of aggravated robbery in order to be sentenced as a repeat violent offender under Tennessee Code Annotated section 40-35-120.

Devin Terry testified at trial that at approximately 1:45 or 2:00 a.m. on May 31, 2010, he had just finished playing basketball. He drove to pick up his friend, Nicolette Henderson, and they went together to a park in Shelby County. Terry was driving a 2001 Ford Focus. Shortly after arriving at the park and while still in the car, Terry looked down at his phone. "[T]he next thing [he knew]," someone shattered both windows on the driver's side. Someone said to him, "Give me everything . . . you got." Terry noticed three individuals surrounding the car – two men standing on the driver's side and one female standing on the passenger's side.

Terry stated that these three individuals took his phone, the key to his car, and his shorts. He believed that the individuals also took Henderson's pants. During this incident, Terry noticed that each man had something in his hand – the man standing closer to the front of the car had "something black," and the other had "something brown." Terry could not discern what the black item was, but he described the brown item as "a log or a four by four." Terry estimated that the man standing closer to the front of the car was in his thirties and that the man farther back looked like a teenager. He could not discern the age of the female or whether she had something in her hand. The three individuals involved in the robbery continued "rummaging" through Terry's vehicle until a Chevrolet Tahoe arrived. At that point, those three individuals immediately left in the Tahoe. Terry identified pictures of his vehicle that showed glass in the driver's seat where he was sitting, as well as compact discs ("CDs") and paper strewn from the car.

On cross-examination, Terry acknowledged that the passenger side of the car also had broken glass. He denied seeing who broke the windows or who said, "Give us what you got." Terry confirmed that the three individuals involved in the robbery did not have anything in their hands as they rummaged through Terry's car. Terry stated that he was sitting still during this ordeal, which lasted for approximately five minutes.

Nicolette Henderson testified that on May 31, 2010, she was with Terry at a park in Shelby County. They were sitting in Terry's aunt's vehicle, and she was sitting in the front passenger seat. She stated,

When we first pulled into the park, I saw a woman, but I didn't think nothing [sic] of it. We sat in the park, and we began to talk; and then two men approached [Terry's] side of the vehicle and a lady came on mine. The guys

-2-

broke the glass on [Terry's] vehicle and kind of pushed him over into my lap. After that, we were told to close our eyes while the guy began to search [Terry] and the girl began to search me.

Henderson observed that the younger male had a bat and that the female had what Henderson described as a "shank knife" or "box cutter." She estimated that the blade on the knife was approximately three inches long. According to Henderson, the female pointed the knife toward Henderson's neck and said, "Close your eyes." The female searched Henderson and, in the process, removed and confiscated Henderson's shorts and shoes. From the broken glass, Henderson had scratches on her leg and the left side of her body.

After the incident, police arrived at the scene and spoke with Henderson. She agreed to give a statement at the police station, where she also was shown a photographic lineup. At trial, she recounted identifying two individuals as two of the three perpetrators. Further, she noted that the man she identified in the lineup was the man who searched Terry's shorts and put his hand inside her bra to check for money. This man was the younger of the two men engaged in the robbery. Henderson could not remember which man broke the windows. However, she acknowledged that in her statement to police she stated that the younger man broke the windows. She also noted that the woman she identified in the lineup was the woman who stole her shorts and held the "shank knife."

Sergeant Glen Barber, with the Memphis Police Department, testified that he was the lead investigator on this case. At some point after the robbery, three suspects surfaced as the potential offenders: the Defendant; the Defendant's cousin, Andrea Key; and the Defendant's nephew, Octavius Key. Sergeant Barber had the opportunity to speak with the Defendant on June 1, 2010, at which point Sergeant Barber advised the Defendant of his Miranda rights. The Defendant signed an advice of rights form. During the interview, the Defendant confirmed that he participated in the robbery at O'Brien Park on May 31, 2010. The Defendant identified his nephew, Octavius,[1] and his cousin, Andrea Key, in a photographic lineup as the other participants in the robbery. He denied that he was armed but stated that he had his dogs with him. Regarding the others' weapons, the Defendant stated, "Octavius had a stick, and I don't know what Andrea had. I just heard her over there hollering at [Henderson]."

---

[1] The individuals involved in the commission of the robberies share a common surname. Therefore, we will refer to these individuals using their given names. We intend no disrespect.

The Defendant, in his statement, described the details of the robbery as follows:

> We were . . . sitting in the park, and I was sitting on the table, and my dogs was [sic] under me, and . . . Andrea and Octavius walked off to the store, and a black car pulled up in the park, and they went to the store; and when they were coming back, I walked up toward them; and we met up not too far from the car; and Andrea said, "Let's get 'em.'"

> Octavius knocked the back window out, and I knocked the front window out. And I opened the door and got in and started searching the car. I heard Andrea tell them to give their clothes up and to get out and to run through the park.

> Once I got done searching, I seen [sic] a truck pull up, and I grabbed the CDs and I ran.

When asked where the items were that they obtained from the robbery, the Defendant answered, "You've got to ask Andrea. She had the keys and CDs. She said that she was going to sell the phone, too."

The Defendant described the roles that each of the perpetrators played in the robbery as follows: "I busted the window out and searched for CDs. Octavius busted a window out and searched the car too. Andrea was hollering and going through the glove compartment. I know she opened the door on the other side."

The Defendant stated that he did not keep any of the items taken in the robbery because Andrea confiscated all the items. At the conclusion of his statement, the Defendant stated, "I would like to say that I apologize. . . . I get put in certain situations sometimes and don't do no [sic] thinking. I can't explain it, and ain't nobody [sic] helping me to understand it, but I am really sorry for what I did."

On cross-examination, Sergeant Barber agreed that the Defendant originally told a story that was not as believable, based on Sergeant Barber's discussions with Octavius and Henderson. Sergeant Barber told the Defendant some of the facts he had learned previously, and the Defendant then gave the statement read at trial. Defense counsel asked Sergeant Barber about his belief that the Defendant used a rock during the commission of the robbery. Sergeant Barber acknowledged that he did not follow up with the Defendant when the Defendant denied having a weapon. However, Sergeant Barber "kn[ew] there was a rock."

-4-

Octavius Key testified that in May 2010, he was sixteen years old. He lived with his mother and grandmother, and the Defendant also lived with them at that time. On May 31, 2010, Octavius heard the Defendant and Andrea talking about comitting a robbery. Although the Defendant told Octavius to stay at home, Andrea told Octavius to come along with them. He recalled that Andrea had a box cutter with her. They arrived at the nearby park sometime after midnight, and they sat, waiting for a car to arrive.

When a car arrived, Octavius approached the car and reported to the others that two individuals were inside the car. The Defendant instructed him to throw a brick at the window, and he obeyed. Then, Andrea approached the right side of the car, and the Defendant approached the left side. Octavius searched the male and also searched the female's bra for money. The Defendant searched the car, and Andrea searched the female. From their search, they confiscated a cell phone, some CDs, and a pair of black shorts. Octavius stated that the Defendant kept the CDs and cell phone and that he (Octavius) did not get anything from the robbery.

After the robbery, Octavius and the Defendant went home to sleep. The police woke them about two hours later and arrested them. Octavius acknowledged that he gave an initial statement to police but told them that his only involvement in the robbery was that he threw a rock at the window. Octavius stated that the only weapon that he had was a stick that he picked up at the park. He estimated that the stick was approximately two inches long by two inches wide. He acknowledged telling police that the stick was two *feet* long by three inches wide but insisted that the stick actually was only two inches long. Octavius stated that he was carrying the stick for protection.

At the conclusion of the State's proof, the Defendant moved for a judgment of acquittal, and the trial court denied the motion. The Defendant chose not to testify and elicited no proof.

At the close of proof, the jury deliberated and returned a verdict of guilty for both counts of aggravated robbery. The trial court then proceeded with the second portion of the trial to allow the jury to determine whether the Defendant had at least two prior convictions for aggravated robbery.

Sonia Rogers, with the Shelby County Sheriff's Department, testified as an expert in fingerprint examination. She stated that she analyzed the fingerprints contained within the Defendant's records and confirmed that the fingerprints matched those of the Defendant.

Stephanie Herbin, a deputy court clerk with the Shelby County Criminal Court, testified that she maintains records for the court. She attested to the fact that the Defendant

pleaded guilty to three counts of aggravated robbery on March 2, 1999. For those convictions, the Defendant served an effective sentence of nine years. She also identified a record indicating that the Defendant pleaded guilty to one count of aggravated robbery on March 19, 2007. For that conviction, the Defendant served eight years in incarceration at 30%. The State rested its proof, and the defense offered no proof. The jury deliberated and determined that "the [D]efendant has at least two prior convictions for aggravated robbery."

Based on the jury's verdict, the trial court sentenced the Defendant to two concurrent[2] terms of life without parole pursuant to Tennessee Code Annotated section 40-35-120. The Defendant filed a motion for new trial, which the trial court subsequently denied. He now appeals, arguing that the evidence is insufficient to support his convictions.

**ANALYSIS**

Sufficiency of the Evidence

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable

---

[2] Both written judgments indicate that the two sentences of life without parole were to run concurrently. However, in the transcript of the sentencing hearing, the trial court announced that it was sentencing the Defendant to two consecutive terms of life without parole.

hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

In our review, we yield to the jury's determinations regarding "[q]uestions concerning the credibility of witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence." State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002) (citing State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999)). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citation omitted).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2006). A robbery becomes aggravated when it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." Tenn. Code Ann. § 39-13-402(a) (2006). A deadly weapon, for purposes of this statute, is defined as "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Id. § 39-13-402(a)(5)(B).

The Defendant contends that the evidence is not sufficient to support his two convictions for aggravated robbery. The State responds that the evidence is sufficient to establish the Defendant's guilt through his own conduct and through the "conduct of others for which he was criminally responsible."

The jury received an instruction as to criminal responsibility. Pursuant to Tennessee statute, "A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401 (2006). Furthermore, a defendant is "criminally responsible for an offense committed by the conduct of another" when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Id. § 39-11-402(2) (2006). Our supreme court has explained that our criminal responsibility statute is premised on the view that "in addition to the primary criminal actor, aiders and abettors should be held accountable for the criminal harms they intentionally facilitated or helped set in motion." State v. Hatcher, 310 S.W.3d 788, 811 (Tenn. 2010) (quoting State v. Sherman, 266 S.W.3d 395, 408 (Tenn. 2008)). While a person's mere presence during the commission of a crime is not sufficient to confer criminal liability, it is not necessary that one physically commit the underlying offense; encouragement of the principal actor will establish such liability. Sherman, 266 S.W.3d at

408. A person convicted under a theory of criminal responsibility is considered a principal offender as if he committed the underlying offense himself. Hatcher, 310 S.W.3d at 811.

The proof at trial established that the Defendant and Andrea discussed committing a robbery while still at their home on the evening of May 30, 2010. Around midnight, they decided to walk to a nearby park to commit the robbery and allowed Octavius to join them. Terry and Henderson drove into the park sometime after approximately 1:45 or 2:00 a.m. Within a few minutes of entering the park, someone shattered both windows on the driver's side, where Terry was sitting. Terry observed two men and one woman surround the car. He stated that one man had "something brown" in his hand that Terry described as either "a log or a four by four." Henderson recalled that the object was a bat. Octavius later admitted that he was carrying a stick "for protection." Despite his prior statement that the stick was two feet long, Octavius insisted at trial that the stick was only two inches long.

After knocking out the window, one of the individuals involved in the robbery told Terry, "Give me everything . . . you got." As a result of the robbery, the perpetrators took Terry's phone, car keys, and shorts.

Henderson testified that a woman approached the passenger side of the car holding a "shank knife" that she estimated had a blade of approximately three inches. This female pointed the "shank knife" at Henderson's neck and stated, "Close your eyes." The female then proceeded to confiscate Henderson's shorts and shoes.

The Defendant, in a statement to Sergeant Barber, admitted to his involvement in the robbery of Terry and Henderson. He denied having a weapon but remembered that Octavius had a stick. The Defendant did not remember that Andrea had a weapon. In discussing his role, the Defendant admitted to knocking out the front, driver's side window and searching inside the car for valuables.

The State presented ample evidence for the jury to conclude that, at the very least, the Defendant aided in the commission of, and, thus, was criminally responsible for, the aggravated robberies of Terry and Henderson. Therefore, when viewed in a light most favorable to the State, the evidence presented at trial was sufficient to support the Defendant's convictions for aggravated robbery. Accordingly, the Defendant is entitled to no relief.

**CONCLUSION**

For the reasons articulated above, we affirm the Defendant's convictions for aggravated robbery.

_____
JEFFREY S. BIVINS, JUDGE